1
2
3
4
5
6

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

7

8  GARY ANTHONY WADE,

9                          Petitioner,          Case No. C16-1645-JCC-MAT

10        v.

11  DEAN MASON,                                 REPORT AND RECOMMENDATION

12                          Respondent.

13

14              INTRODUCTION AND SUMMARY CONCLUSION

15        Petitioner Gary Anthony Wade is a state prisoner who is currently confined at the

16  Washington Corrections Center in Shelton, Washington.  He seeks relief under 28 U.S.C.

17  § 2254 from a 2012 King County Superior Court judgment and sentence.  Respondent has filed

18  an answer responding to petitioner's federal habeas claims, and has submitted relevant portions

19  of the state court record.  This Court, having carefully reviewed petitioner's petition,

20  respondent's answer, and the balance of the record, concludes that petitioner's petition for writ of

21  habeas corpus should be denied and this action should be dismissed with prejudice.

22                      FACTUAL BACKGROUND

23        The Washington Court of Appeals, on direct appeal, summarized the facts underlying

REPORT AND RECOMMENDATION - 1

petitioner's conviction:

In 2010, Michelle Thornton worked as a cashier at the Upper Queen Anne Safeway and lived at the Vine Court Apartments in Belltown. Thornton was a mature and "dependable" employee, "always on time, . . . always well dressed." The Vine Court Apartments is a secure building with a "high end" video security system. To gain access to the building, a person must have a key or be "buzzed in" by a resident through a keypad.

Thornton was friendly and outgoing and invited people to "her apartment quite a bit." Thornton had a view of the Space Needle from her apartment and hosted an annual New Year's Eve party with her friends to watch the fireworks. Thornton's friends described her as "fun to be around. She loved life and loved getting outdoors." Thornton also liked to drink alcohol and use drugs. Gary Wade often delivered cocaine to Thornton at her apartment and sometimes stayed and smoked crack cocaine with Thornton and her friends.

On December 28, 2010, Thornton posted an invitation to her annual New Year's Eve party on her Facebook page. Thornton called her longtime "neighbor and friend" of 21 years Richard Bollinger twice that day to ask him to get her some "crack." Bollinger told her "he was trying to get off [drugs]" and had erased from his phone "all the contact information for anybody who [he] knew had any relationship to drugs and drug dealing." Later that night, Thornton went out for pizza with her friend Charles Cruise. Thornton and Cruise had been "great friends" for 20 years.

Thornton did not show up for her scheduled 2:15 p.m. shift at Safeway on December 30 or for her morning shift the next day, December 31. Safeway Manager Gregory Fox thought it "odd" because she had never "just failed to appear." It was "not like [Thornton] at all to miss work."

Thornton's friend and coworker Andrew Laissue called Thornton on December 30 but was not able to reach her. Cruise tried calling Thornton on December 29 or 30. Cruise said someone picked up the phone and then "hung it up" without saying anything. Thornton's New Year's Eve party did not take place as planned.

On January 3, 2011, Cruise asked the police to check on Thornton. Seattle Police Department Officer Mark Bisson and Officer Robin Roberts went to the apartment building with Cruise. The apartment manager let them into Thornton's apartment. Cruise stood in the doorway while the officers quickly checked the living room, kitchen, bedroom, and bathroom. The officers were inside Thornton's apartment for only "15 to 30 seconds" because it was a "welfare check . . . on the person to see if they were home."

REPORT AND RECOMMENDATION - 2

On January 4, Thornton's father filed a "missing person" report. On January 6, Detective Tony Eng and Detective David Ogard used the apartment manager's key to unlock the door to Thornton's apartment. During the search of the apartment, Detective Ogard discovered Thornton's body inside the hall closet. Thornton was lying face up with her head "jammed against the door" and her feet "pressed up against the wall." Thornton was naked from the waist down and had dried blood on her forehead. Detectives Eng and Ogard contacted Homicide Detective Timothy DeVore and Detective Jeffrey Mudd, the crime scene investigation unit, and a pathologist from the King County Medical Examiner's Office.

Seattle Police Department Crime Scene Investigation Unit Detective Kimberly Biggs testified there were no pry marks or signs of forced entry on the door or doorframe of the apartment. The police found a broken phone cord by the front door but the telephone was missing.[1] The police did not find any keys to the apartment.

Detective Mudd testified that the living room looked as though "there might have been some kind of struggle." The couch was "askew" and there was a broken picture frame on the floor. To the left of the couch was a beige extension cord with "bent prongs and suspected feces." The police found a pink bathrobe to the right of the couch with what appeared to be fecal stains. They found the belt to the bathrobe on the living room floor.

The police also found feces on the living room floor, on a towel in the bathroom, and on pajama bottoms in the bedroom. They found underwear tangled up with blue tights, stained with feces, in the bathtub. The tights were partly inside out, as if "removed off a person at the same time [as the underwear] in one motion."

King County Medical Examiner's Office Forensic Pathologist Dr. Timothy Williams examined Thornton's body at the apartment. The trail of dried blood from the abrasion on the right side of her nose ran across her forehead "in a direction against gravity" as compared to the position of the body in the closet. Dr. Williams testified the line of dried blood on her forehead was "consistent with the body having been moved at some point after that blood had started to run."

Dr. Williams also observed "a number of abrasions on her neck" and "a large number of . . . petechial hemorrhages, small pinpoint hemorrhages in the skin of the face." Dr. Williams testified that Thornton's face was "engorged with blood," creating a "distinct possibility" that she had been strangled. According to Dr. Williams, it is "very common" for a person to "evacuate their bowels" upon death.

---

[1] [Court of Appeals' footnote] Thornton had a landline and did not own a cell phone.

REPORT AND RECOMMENDATION - 3

Dr. Williams estimated the time of death at 1:00 a.m. on December 30. A toxicology report later showed Thornton had a blood alcohol level of .07 grams per decaliter and her blood contained cocaine metabolites. Dr. Williams concluded the death was a homicide, and the manner of death was asphyxia from strangulation.

Seattle Police Department Latent Fingerprint Examiner Betty Newlin processed the apartment for latent prints. Washington State Patrol Crime Laboratory (WSPCL) Forensic Scientist Kari O'Neill obtained swabs from Thornton's body for DNA[2] testing. O'Neill later determined the DNA profile from the left and right nipple was "consistent with coming from the same unknown male individual."

Initially, the police investigation focused on Thornton's ex-boyfriend Georgios Broutzakis. In June 2009, Broutzakis was convicted of assaulting Thornton and the court issued a no-contact order. The police interviewed Broutzakis on January 21.

Broutzakis denied any involvement in Thornton's death and gave the police a DNA sample. Broutzakis acknowledged leaving nine of the saved voicemail messages on Thornton's phone, including several threatening messages. Five of the messages are from May 2009 and May 2010, and four of the messages are from August, October, and November 2010. The final three messages are not threatening. In the last three messages, Broutzakis tells Thornton he loves her, he is "trying to change," and he is going to go to "treatment." Broutzakis told police the last time he was in Thornton's apartment was in October 2010 and his last contact with her was the voicemail he left in November 2010.

The DNA profile from Broutzakis did not match any of the evidence recovered from the apartment or Thornton's body. The police examined fingerprints from Broutzakis against "every print of comparison value." His fingerprints did not match any of the latent prints.

Police reviewed hundreds of hours of video from the four security system cameras at the Vine Court Apartments for late December 2010 through early January 2011. The police did not see Broutzakis in any of the video from the four cameras. However, the cameras located at the main entry and lobby show a man, later identified as Gary Wade, entering and exiting the apartment building almost every night between December 22 and 29 and several times on December 30.

The video shows Wade stayed overnight on December 25 and left at 5:42

---

[2] [Court of Appeals' footnote]  Deoxyribonucleic acid.

REPORT AND RECOMMENDATION - 4

a.m.[3] on December 26.  Wade next enters the building at 7:55 p.m. on December 29 and exits 13 minutes later.  Thornton leaves the building through the alleyway door a few minutes later.  The surveillance video shows Thornton and Wade enter the building together at 8:17 p.m.  At 9:38 p.m., Thornton exits the building and at 9:44 p.m., uses her key to get back inside.

At 12:48 a.m. on December 30, Thornton leaves the building again and at 1:01 a.m., lets herself back in with a key.  At 2:26 a.m., Wade leaves the building but returns a minute later and uses the keypad to gain access.  At 2:14 p.m., Wade leaves the apartment building with a bag slung over one shoulder and carrying a plastic grocery bag.  When Wade returns at 4:09 p.m., he lets himself into the building with a key.  The last time Wade appears on the surveillance video is when he leaves the apartment building approximately 10 minutes later at 4:20 p.m.

Detective Randy Moore arrested Wade on February 26.  During a lengthy interview, Wade admitted "provid[ing]" cocaine to Thornton in the past and smoking "crack" with her in her apartment on several occasions.  At first, Wade maintained the last time he had been in Thornton's apartment was before Christmas.  Wade told the detectives that he tried calling Thornton after Christmas but said she did not answer her phone.

The detectives then showed Wade the time-stamped keypad entries and time-stamped photographs from the surveillance video that showed he entered and exited the building on December 29 and 30, and in the late afternoon of December 30, he used a key to enter the apartment building.  In response, Wade said that he and Thornton had sex in the early morning hours of December 30, and Thornton gave him her key to "mak[e] a [drug] run."  Wade told the detectives that at some point, Thornton "said she didn't feel good."  Wade insisted he returned the key to Thornton and she was still alive when he left.  Wade also insisted that Thornton called him after he left on December 30 "because she need[ed] to see [him]."

However, Wade later admitted placing Thornton in the closet after she had a heart attack.  Wade said a neighbor knocked on the door, and he "panicked."

See okay when I seen her laid out right there, right.  You could tell she had a heart attack.  Just laid out.  Then I panicked.  But then I was about to leave and I grabbed my bag and was about to leave out.  And then the neighbor knock on the door.  So I got scared and put her nicely in the closet and closed the door and left.

The police obtained a DNA sample from Wade.  O'Neill compared the

---

[3] [Court of Appeals' footnote]  Throughout the opinion, surveillance video times have been adjusted by 39 minutes in accord with the testimony that the time stamp on the surveillance video was "39 minutes slow."

REPORT AND RECOMMENDATION - 5

DNA to the fingernail clippings from Thornton, the belt from the pink bathrobe, and the beige extension cord. Wade's DNA matched the DNA profile of the unknown male O'Neill found on Thornton's body and the DNA found under Thornton's fingernails. Wade's fingerprints matched the latent prints found on beer cans in Thornton's apartment. Phone records for Wade and Thornton established that the last time he called Thornton was the evening of December 29, 2010. The state charged Wade with murder in the second degree.

During the 13-day jury trial, more than 30 witnesses testified and the court admitted into evidence more than 140 exhibits, including surveillance video from the apartment building and time-stamped photographs from the video. The court also admitted into evidence and played the video of the police interview with Wade.

Several of Thornton's friends, including Bollinger, testified that Wade supplied Thornton with cocaine and Wade was at her apartment on several different occasions. Bollinger testified that on at least four or five occasions, Wade was already there when he arrived.

Bollinger also testified that Thornton was "outgoing to a fault," and often "would allow people to sleep over[night] in her living room that I wouldn't have chosen to allow to sleep over in my living room." Bollinger said that Wade "crashed" at Thornton's apartment "at least a few weeks" before Christmas 2010.

Dr. Williams testified that Thornton died of asphyxia from strangulation. Dr. Williams stated that the "discontinuous nature of the abrasions" on Thornton's neck were more consistent with manual strangulation than ligature strangulation. Dr. Williams testified that with sufficient pressure "consistently applied," a person could be rendered unconscious within 10 to 15 second, but it would take 1 to 2 minutes for asphyxia to occur. Dr. Williams estimated the time of death at around 1:00 a.m. on December 30.

The State presented evidenced establishing Thornton was not alive when Wade left her apartment the afternoon of December 30. In addition to the testimony that Thornton failed to show up for her scheduled 2:15 p.m. shift at Safeway, Detective DeVore testified that records from the Vine Court Apartments door entry system show the last time Thornton granted access to the building for someone was at 2:27 a.m. on December 30, and the surveillance video confirms the last person Thornton "buzzed in" was Wade at 2:27 a.m. Detective DeVore also testified that the last outgoing phone call made from the apartment was at 3:00 a.m. on December 30 to an Internet dial-up company, and that there were unanswered voicemail messages left on December 30 and 31. Detective David Dunn said that the last time anyone used Thornton's computer was at 4:12 a.m. on December 30. The State also presented evidence that the last activity on her Key

REPORT AND RECOMMENDATION - 6

Bank account was an ATM[4] withdrawal on December 29.

WSPCL Forensic Scientist O'Neill testified that in addition to the swabs from Thornton's body, she tested the beige extension cord, the belt from the pink bathrobe, and Thornton's fingernail clippings for DNA. O'Neill testified that DNA testing excluded Wade as a possible contributor to the DNA on the extension cord. O'Neill testified that the DNA on the bathrobe belt was a "mixed profile that was consistent with at least three people" and Thornton and Wade were "possible contributors." O'Neill testified that the DNA found on Thornton's nipples and underneath her fingernails matched Wade's DNA. O'Neill stated that the probability of finding someone else with the same DNA profile was "one in 540 quadrillion." O'Neill also testified there were no sperm cells or semen samples from Thornton.

Fingerprint examiner Newlin testified that Wade's fingerprints matched the prints found on four beer cans and the coffee table in the apartment.

The defense called three witnesses. Dr. Donald Riley testified there may have been cross-contamination of the DNA evidence because the fingernail evidence was not "kept separate" from Wade's reference sample. Dr. Riley also questioned the method of calculating the "inclusion statistic" in the mixed DNA profile found on the bathrobe belt, stating that the test O'Neill used to conclude Wade was a possible contributor was "designed primarily for single source DNA samples."

The defense called Broutzakis to testify. Broutzakis said he dated Thornton "on and off for a couple years. Maybe a little less." Broutzakis testified that Thornton gave him her keys "[t]wo or three times" to "go to Ballard and score [drugs] and come back so [he] wouldn't have to ring the bell," but he never had her keys for more than a day. Broutzakis said his relationship with Thornton ended approximately six months before Christmas 2010.

The defense investigator testified that he reviewed the surveillance video from December 29 and 30, 2010, and he saw individuals gaining entry to the building by "either coming in without a key or propping open" an alleyway door. But on cross-examination, the investigator testified that on December 30, between 2:14 p.m. when Wade left the apartment building and 4:09 p.m. when Wade returned, he did not see anyone entering the building through the front door without a key or through the alleyway door.

In rebuttal, O'Neill testified in response to the testimony of Dr. Riley. O'Neill stated that Wade's reference sample was never "open and near the open . . . evidence samples in this case."

---

[4] [Court of Appeals' footnote]  Automated teller machine.

REPORT AND RECOMMENDATION - 7

At the conclusion of the case, Wade asked the court to instruct the jury on the inferior degree offense of both manslaughter in the first degree and manslaughter in the second degree. The court refused to instruct the jury on the inferior offenses. The court ruled no evidence showed Wade committed either manslaughter in the first degree or manslaughter in the second degree.

In closing, the prosecutor argued Wade "strangled Ms. Thornton to death, and that he did it before he left the first time at two p.m. on December 30th." Defense counsel argued the State did not prove motive or when Thornton died. The attorney also argued there was no evidence of Wade's DNA on Thornton's neck or on the extension cord, and noted there was DNA from a third unidentified individual on the bathrobe belt. In addition, the attorney argued the investigation into Thornton's death was flawed because the police failed to investigate other possible suspects, including Bollinger, and there were ways to enter the apartment building without appearing on the surveillance video.

The jury convicted Wade of murder in the second degree.

Before the sentencing hearing, the State submitted a memorandum asserting that with an offender score of 3, the standard sentence range was 154 to 254 months. The offender score included three prior felony convictions: a 2002 Florida conviction, a 2002 Georgia conviction, and a 2006 Utah conviction.

Wade acknowledged the existence of the prior convictions but argued the Utah conviction for attempted distribution of cocaine was not comparable. The court disagreed. Based on an offender score of 3, the court imposed a high-end standard range sentence of 254 months.

(Dkt. 10, Ex. 2 at 1-11.)

PROCEDURAL BACKGROUND

Petitioner, through counsel, appealed his judgment and sentence to the Washington Court of Appeals. (*See id.*, Ex. 3.) Petitioner argued on appeal that: (1) he was denied his right to confront witnesses against him when the person who investigated and obtained critical bank records of the victim did not testify at trial; (2) the trial court erred in failing to instruct the jury on the lesser included offenses of first and second degree manslaughter; (3) the trial court erred in ruling that petitioner's prior Utah conviction was comparable to a Washington felony offense;

REPORT AND RECOMMENDATION - 8

(4) the exclusion of evidence of another suspect violated petitioner's constitutionally protected right to present a defense; (5) Officer Moore's reference to petitioner's booking photo so prejudiced petitioner's ability to receive a fair trial that a mistrial was the only remedy; and, (6) the cumulative effect of the multiple errors requires reversal of petitioner's conviction. (*See* Dkt. 10, Ex. 3 at 6, 14, 18, 23, 35, and 39.)  On March 30, 2015, the Washington Court of Appeals issued a published opinion affirming petitioner's conviction and sentence.  (*Id.*, Ex. 2.)

Petitioner thereafter filed a petition for review in the Washington Supreme Court.  (*Id.*, Ex. 6.)  Petitioner argued therein that:  (1) the trial court incorrectly applied the "other suspects" evidence test in contradiction of the court's decision in *State v. Franklin*; (2) the violation of petitioner's right to confrontation prejudiced him and requires reversal of his conviction; and, (3) there were sufficient facts in the record to support the lesser included offense instructions for manslaughter.  (*See id.*, Ex. 6 at 6, 8, and 10.)  The Supreme Court denied petitioner's petition for review without comment on September 30, 2015.  (*Id.*, Ex. 7.)  The Court of Appeals issued a mandate terminating direct review on November 13, 2015.  *See* http: //dw.courts.wa.gov (follow "Case Search Options" hyperlink; then go to "Appellate Court Cases" tab; then follow "Appellate Case Number Search" hyperlink; then search "Court Name:  COA, Division I" and "Case Number: 695274").

## GROUNDS FOR RELIEF

Petitioner identifies the following five grounds for relief in his federal habeas petition:

GROUND ONE:      Mr. Wade was denied his right to confront the witnesses against him when the person who investigated and obtained critical bank records of the victim did not testify at trial.

GROUND TWO:      The exclusion of evidence of another suspect violated Mr. Wade's constitutionally protected right to present a defense.  The trial court incorrectly applied the "other suspects" evidence test in contradiction of this

REPORT AND RECOMMENDATION - 9

court's decision in State v. Franklin.

GROUND THREE:   The trial court erred in failing to instruct the jury on the lesser included offenses of first and second degree manslaughter.   There were sufficient facts in the record to support the lesser included offense.

GROUND FOUR:     Officer Moore's reference to Mr. Wade's booking photo so prejudiced Mr. Wade's ability to receive a fair trial that a mistrial was the only remedy.

GROUND FIVE:     The trial court erred in ruling that Mr. Wade's Utah prior conviction was comparable to a Washington felony offense.

(*See* Dkt. 3 at 5, 7, 8, 10 and 12.)

## DISCUSSION

Respondent asserts in his answer to the petition that petitioner has properly exhausted some, but not all, of his federal habeas claims.   Specifically, respondent asserts that petitioner failed to properly exhaust a part of his second ground for relief, and the entirety of his fourth and fifth grounds for relief.   Respondent argues that petitioner's unexhausted claims are now procedurally defaulted, and that the state courts reasonably denied petitioner's remaining claims.

### Exhaustion

A state prisoner is required to exhaust all available state court remedies before seeking a federal writ of habeas corpus. 28 U.S.C. § 2254(b)(1).   The exhaustion requirement is a matter of comity, intended to afford the state courts "an initial opportunity to pass upon and correct alleged violations of its prisoners' federal rights." *Picard v. Connor*, 404 U.S. 270, 275 (1971) (internal quotation marks and citations omitted).   In order to provide the state courts with the requisite "opportunity" to consider his federal claims, a prisoner must "fairly present" his claims to each appropriate state court for review, including a state supreme court with powers of discretionary review. *Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (citing *Duncan v. Henry*, 513

REPORT AND RECOMMENDATION - 10

U.S. 364, 365 (1995), and *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999)).

It is not enough that all the facts necessary to support a prisoner's federal claim were before the state courts or that a somewhat similar state law claim was made. *Anderson v. Harless*, 459 U.S. 4, 6 (1982).  The habeas petitioner must have fairly presented to the state courts the substance of his federal habeas corpus claims. *Id*.  "If a petitioner fails to alert the state court to the fact that he is raising a federal constitutional claim, his federal claim is unexhausted regardless of its similarity to the issues raised in state court." *Johnson v. Zenon*, 88 F.3d 828, 830 (9th Cir. 1996).

A habeas petitioner who fails to meet a state's procedural requirements for presenting his federal claims deprives the state courts of the opportunity to address those claims in the first instance. *See Coleman v. Thompson*, 501 U.S. 722, 732 (1991).  Presenting a new claim to the state's highest court in a procedural context in which its merits will not be considered absent special circumstances does not constitute fair presentation of the claim for exhaustion purposes. *Roettgen v. Copeland*, 33 F.3d 36, 38 (9th Cir. 1994) (citing *Castille v. Peoples*, 489 U.S. 346, 351 (1989)).

Petitioner asserts in his second ground for federal habeas relief that the exclusion of evidence of another suspect violated his constitutionally protected right to present a defense, and that the trial court incorrectly applied the "other suspects" evidence test under *State v. Franklin*, 180 Wn. 2d 371 (2014).  (Dkt. 3 at 7.)  Respondent argues that petitioner failed to properly exhaust the portion of this claim pertaining to the application of the Washington Supreme Court's decision in *Franklin* because he didn't properly present this portion of his claim to the Washington Court of Appeals.  (Dkt. 8 at 17.)  Respondent contends that petitioner merely presented *Franklin* to the Court of Appeals as additional authority with no accompanying

REPORT AND RECOMMENDATION - 11

argument, and that this is insufficient under Ninth Circuit precedent to constitute proper exhaustion.  (Dkt. 8 at 17.)

Respondent fails to recognize, or at least to acknowledge, the unique circumstances under which the *Franklin* decision was introduced into petitioner's case.  The *Franklin* decision was not issued by the Washington Supreme Court until May 8, 2014, over six months after petitioner filed his opening brief on appeal.  *See State v. Franklin*, 180 Wn.2d 371 (2014) and Dkt. 10, Ex. 3.  Consistent with the Washington Rules of Appellate Procedure, petitioner submitted a Statement of Additional Authorities to the Court of Appeals identifying *Franklin* as additional authority and noting its applicability to the issue of other suspect evidence.  *See* Washington RAP 10.8.  Petitioner was not permitted under RAP 10.8 to present any argument in support of the issue for which the additional authority was offered.  *See id*.  The Court of Appeals discussed the *Franklin* decision in its opinion and relied heavily on that case in rejecting petitioner's claim that the trial court violated his constitutional right to present a defense.  (Dkt. 10, Ex. 2 at 12-17.)

Petitioner proceeded to argue to the Washington Supreme Court, in support of his claim that the trial court violated his constitutional right to present a defense, that both the trial court and the Court of Appeals had misapplied the "other suspects" evidence test as enunciated in *Franklin*, and that his conviction should therefore be reversed.  (*Id.*, Ex. 6 at 6-8.)  Given that both the Washington Court of Appeals and the Washington Supreme Court had the opportunity to consider the import and applicability of *Franklin* in resolving petitioner's claim that the trial court violated his constitutional right to present a defense, this Court concludes that petitioner properly exhausted the entirety of his second ground for relief.

Petitioner asserts in his fourth ground for relief that a reference to his booking photo by one of the state's witnesses, Office Moore, so prejudiced petitioner's ability to receive a fair trial

REPORT AND RECOMMENDATION - 12

that a mistrial was the only remedy.  (Dkt. 3 at 10.)  Petitioner asserts in his fifth ground for relief that the trial court erred in ruling that his prior Utah conviction was comparable to a Washington felony offense.  (*Id*. at 12.)  Respondent argues that petitioner failed to properly exhaust these claims because he failed to present the claims to the Washington Supreme Court in their entirety.  (*See* Dkt. 8 at 18.)  The record makes clear that petitioner did not present either his fourth or fifth ground for federal habeas relief to the Washington Supreme Court in his petition for review.  (*See* Dkt. 10, Ex. 6.)  Thus, these claims have clearly not been exhausted.

<u>Procedural Default</u>

When a petitioner fails to exhaust his state court remedies and the court to which petitioner would be required to present his claims in order to satisfy the exhaustion requirement would now find the claims to be procedurally barred, there is a procedural default for purposes of federal habeas review.  *Coleman*, 501 U.S. at 735 n. 1.

Respondent argues that petitioner, having failed to properly exhaust some of his federal habeas claims, would now be barred from presenting those claims to the state courts under RCW 10.73.090.  (Dkt. 8 at 19.)  RCW 10.73.090(1) provides that a petition for collateral attack on a judgment and sentence in a criminal case must be filed within one year after the judgment becomes final.  Petitioner's conviction became final for purposes of state law on November 13, 2015, the date the Court of Appeals issued its mandate terminating direct review.  *See* RCW 10.73.090(3)(b).  It therefore appears clear that petitioner would now be time barred from returning to the state courts to present his unexhausted claims.  *See* RCW 10.73.090.

When a state prisoner defaults on his federal claims in state court, pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the

REPORT AND RECOMMENDATION - 13

1    alleged violation of federal law, or can demonstrate that failure to consider the claims will result

2    in a fundamental miscarriage of justice.  *Coleman*, 501 U.S. at 750.  Petitioner makes no effort to

3    show cause or prejudice for his default.  He therefore fails to demonstrate that his unexhausted

4    claims are eligible for federal habeas review.   Accordingly, this Court recommends that

5    petitioner's federal habeas petition be denied with respect to his fourth and fifth grounds for

6    relief.

7                              <u>Standard of Review for Exhausted Claims</u>

8           Under the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), a habeas corpus

9    petition may be granted with respect to any claim adjudicated on the merits in state court only if

10   the state court's decision was contrary to, or involved an unreasonable application of, clearly

11   established federal law, as determined by the Supreme Court, or if the decision was based on an

12   unreasonable determination of the facts in light of the evidence presented.  28 U.S.C. § 2254(d).

13          Under the "contrary to" clause, a federal habeas court may grant the writ only if the state

14   court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law,

15   or if the state court decides a case differently than the Supreme Court has on a set of materially

16   indistinguishable facts.  *See Williams v. Taylor*, 529 U.S. 362, 405-06 (2000).   Under the

17   "unreasonable application" clause, a federal habeas court may grant the writ only if the state

18   court identifies the correct governing legal principle from the Supreme Court's decisions, but

19   unreasonably applies that principle to the facts of the prisoner's case.  *See id*. at 407-09.

20          The Supreme Court has made clear that a state court's decision may be overturned only if

21   the application is "objectively unreasonable."  *Lockyer v. Andrade*, 538 U.S. 63, 69 (2003).  The

22   Supreme Court has explained that "[a] state court's determination that a claim lacks merit

23   precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness

REPORT AND RECOMMENDATION - 14

of the state court's decision."   *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

Clearly established federal law, for purposes of AEDPA, means "the governing legal principle or principles set forth by the Supreme Court at the time the state court render[ed] its decision."   *Lockyer*, 538 U.S. at 71-72.   "If no Supreme Court precedent creates clearly established federal law relating to the legal issue the habeas petitioner raised in state court, the state court's decision cannot be contrary to or an unreasonable application of clearly established federal law."   *Brewer v. Hall*, 378 F.3d 952, 955 (9th Cir. 2004) (citing *Dows v. Wood*, 211 F.3d 480, 485-86 (9th Cir. 2000)).

In considering a habeas petition, this Court's review "is limited to the record that was before the state court that adjudicated the claim on the merits."   *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).   If a habeas petitioner challenges the determination of a factual issue by a state court, such determination shall be presumed correct, and the applicant has the burden of rebutting the presumption of correctness by clear and convincing evidence.   28 U.S.C. § 2254(e)(1).

<u>Ground One:  Confrontation Clause</u>

Petitioner asserts in his first ground for relief that he was denied his right to confront witnesses against him when the individual who investigated and obtained critical bank records of the victim did not testify at trial.  (Dkt. 3 at 5.)  At issue in this claim is evidence regarding the date of the last debit card transaction on the victim's bank account.

Janet McGinnis, a financial criminal investigator and finance records custodian at Key Bank, testified on direct examination that the victim's bank statement showed that the last purchase made on the account was a debit card transaction at the Belltown Market which posted

1   to the account on December 31.  (Dkt. 10, Ex. 16 at 113-14.)  Ms. McGinnis testified as well that

2   merchant transactions generally take between 24 and 72 hours to post to an account, and that she

3   knew the Belltown Market transaction had actually taken place on or before December 29.  (*See*

4   *id*., Ex. 16 at 113, 117-18.)  On cross-examination, Ms. McGinnis acknowledged that she was

5   unable to get information regarding the actual date of the Belltown Market transaction from her

6   database, and that she obtained the information from another Key Bank employee.  (*See id*., Ex.

7   16 at 133.)  Petitioner's counsel thereafter moved to strike Ms. McGinnis's testimony regarding

8   the timing of the Belltown Market transaction.   (*Id*., Ex. 16 at 134.)   After permitting the

9   prosecution to conduct some voir dire of the witness, and hearing argument from the parties, the

10   trial court denied the defense motion to strike.  (*See id*., Ex. 16 at 134-154.)

The Washington Court of Appeals, on direct appeal, concluded that the admission of the

12   challenged testimony did, in fact, violate the Confrontation Clause.  The Court of Appeals also

13   concluded, however, that the error was harmless beyond a reasonable doubt for the following

14   reasons:

> The overwhelming untainted evidence established Thornton was not alive on December 31.  Thornton was always on time, but she did not show up for her scheduled 2:15 p.m. shift at Safeway on December 30 or the following day.  The last time someone from Thornton's apartment "buzzed someone in" was December 30.  The last outgoing call from Thornton's landline was in the early morning of December 30, and there were unheard messages from December 30 and 31 left on Thornton's voicemail.  The last time anyone used Thornton's computer was at 4:12 a.m. on December 30.  Friends were not able to reach Thornton after December 30 and she did not hold her planned New Year's Eve party.  And in the videotaped interview with police, Wade admits he was with Thornton on December 30, that Thornton died, and that he placed her in the closet before leaving the apartment later that afternoon.

22   (Dkt. 10, Ex. 2 at 18-19.)

23   On federal habeas review, relief may be granted only if a constitutional error had a

REPORT AND RECOMMENDATION - 16

"substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). This standard is satisfied if the record raises "grave doubt[s]" about whether the error influenced the jury's decision. *Davis v. Ayala*, 135 S.Ct. 2187, 2203 (2015) (quoting *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995)). While a reviewing court, under AEDPA, must accord deference to a state's harmless error determination, the Supreme Court has explained that "a prisoner who seeks federal habeas corpus relief must satisfy *Brecht*, and if the state court adjudicated the claim on the merits, the *Brecht* test subsumes the limitations imposed by AEDPA. *Davis*, 135 S.Ct. at 2199 (citing *Fry v. Pliler*, 551 U.S. 112, 119-20 (2007)). Thus, the inquiry here is whether, in light of the record as a whole, the improper admission of Ms. McGinnis's testimony regarding the timing of the Belltown Market debit card transaction substantially influenced the verdict. *See Brecht*, 507 U.S. at 638–39.

This Court's review of the record confirms the Washington Court of Appeals' conclusion that the overwhelming untainted evidence in the record establishes that the victim, Michelle Thornton, was not alive on December 31, the date the Belltown Market transaction posted. Of particular note is petitioner's admission in his videotaped interview with police that he was with Ms. Thornton on December 30, that she died, and that he placed her in the closet before he left the apartment that day. (*See* Dkt. 10, Ex. 17 at 53-102, 152-53.) In light of this evidence, Ms. McGinnis's testimony that the transaction at the Belltown Market actually occurred prior to December 31could not have had a "substantial and injurious effect or influence in determining the jury's verdict." Petitioner's federal habeas petition should therefore be denied with respect to his first ground for relief.

///

REPORT AND RECOMMENDATION - 17

Ground Two:  Right to Present a Defense

Petitioner asserts in his second ground for relief that the trial court violated his constitutionally protected right to present a defense when it excluded evidence of another possible suspect.  (Dkt. 3 at 7.)  Petitioner moved pretrial to introduce "other suspect evidence" in the form of evidence relating to the victim's ex-boyfriend, Georgios Broutzakis.  (*See* Dkt. 10, Ex. 9 at 28-29.)  After hearing extensive argument from the parties, the trial court denied the defense motion on the grounds that the proffered evidence was speculative and relied on inadmissible hearsay.  (*See id.*, Ex. 9 at 28-64 and Ex. 10 at 3-7.)

"Whether rooted directly in the Due Process Clause of the Fourteenth Amendment, or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, the Constitution guarantees defendants 'a meaningful opportunity to present a complete defense.'"  *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (quoting *California v. Trombetta*, 467 U.S. 479, 485 (1984)) (internal citations omitted).  However, "[a] defendant's right to present relevant evidence is not unlimited, but rather is subject to reasonable restrictions."  *United States v. Scheffer*, 523 U.S. 303, 308 (1998).  A criminal defendant "does not have an unfettered right to offer [evidence] that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence."  *Taylor v. Illinois*, 484 U.S. 400, 410 (1988).  The Supreme Court has explained that "the Constitution permits judges to exclude evidence that is repetitive ..., only marginally relevant or poses an undue risk of harassment, prejudice, [or] confusion of the issues."  *Holmes v. South Carolina*, 547 U.S. 319, 326-27 (2006) (internal quotations omitted).

The Washington Court of Appeals affirmed the trial court's exclusion of the proffered other suspect evidence, explaining its conclusion as follows:

/ / /

REPORT AND RECOMMENDATION - 18

A criminal defendant has a constitutional right to present a defense under the Sixth Amendment of the United States Constitution and article I, section 22 (amendment 10) of the Washington Constitution.  State v. Maupin, 128 Wn.2d 918, 924, 913 P.2d 808 (1996).  But the right to present a defense is not absolute. Montana v. Engelhoff, 518 U.S. 37, 42, 116 S. Ct. 2013, 135 L. Ed. 2d 361 (1996); Maupin, 128 Wn.2d at 924-25.  The right to present a defense does not extend to irrelevant or inadmissible evidence.  State v. Jones, 168 Wn.2d 713, 720, 230 P.3d 576 (2010).

The Washington Supreme Court recently addressed the admissibility of other suspect evidence in State v. Franklin, 180 Wn.2d 371, 325 P.3d 159 (2014). In Franklin, the court concluded the trial court erred in excluding other suspect evidence by considering the strength of the State's case against the defendant and requiring the defense to present direct rather than circumstantial evidence that someone else committed the crime.  Franklin, 180 Wn.2d at 378-79.

The court held the standard for relevance of other suspect evidence is whether there is evidence "'tending to connect' someone other than the defendant with the crime." Franklin, 180 Wn.2d at 382 (quoting State v. Downs, 168 Wash. 664, 667, 13 P.2d 1 (1932)).  "[T]he probative value must be based on whether the evidence has a logical connection to the crime—not based on the strength of the State's evidence." Franklin, 180 Wn.2d at 381-82 (citing Holmes v. South Carolina, 547 U.S. 319, 330, 126 S. Ct. 1727, 164 L. Ed. 2d 503 (2006)). Mere evidence of motive, or motive coupled with threats of the other person, "'is inadmissible, unless coupled with other evidence tending to connect such other person with the actual commission of the crime charged.'" Franklin, 180 Wn.2d at 379-80 (quoting State v. Kwan, 174 Wash. 528, 533, 25 P.2d 104 (1933)). Further, "'[r]emote acts, disconnected and outside of the crime itself, cannot be separately proved for such a purpose.'" Franklin, 180 Wn.2d at 380[5] (quoting Kwan, 174 Wash. at 533); see also Maupin, 128 Wn.2d at 927.  "[S]ome combination of facts or circumstances must point to a nonspeculative link between the other suspect and the charged crime." Franklin, 180 Wn.2d at 381.

We review a trial court's decision to exclude other suspect evidence for abuse of discretion.  Franklin, 180 Wn.2d at 377 n.2.  The court must determine whether the probative value is outweighed by other factors, such as "'unfair prejudice, confusion of the issues, or potential to mislead the jury,'" and focus the trial "'on the central issues by excluding evidence that has only a very weak logical connection to the central issues.'" Franklin, 180 Wn.2d at 378 (quoting Holmes, 547 U.S. at 326, 330).

Below, the defense conceded there was no DNA, fingerprint, or any "specific evidence that specifically indicates that it had to be Georgios Broutzakis

---

[5] [Court of Appeals' footnote]  Alteration in original.

who was in [Thornton's] apartment."   Nonetheless, the defense attorney argued the evidence did not "preclude" the possibility that Broutzakis committed the murder.  The attorney argued the 2009 assault conviction of Broutzakis, the no-contact order prohibiting him from contacting Thornton, and the voicemails he left on Thornton's answering machine "contained implied threats" that established motive and "a substantial step towards committing future acts of violence."  The defense also pointed to statements Thornton made to police after the 2009 assault that Broutzakis previously strangled her and washed off blood in the bathtub.[6]

While the defense acknowledged Broutzakis did not appear on the surveillance video from Thornton's apartment and no witness would testify to letting Broutzakis in the building, the attorney argued there were "other ways" to get into the building without being detected.  The defense asserted the building manager would testify that "there was a time" when tenants were letting Broutzakis into the building without Thornton's knowledge.

The defense also argued that a few days before the murder, Thornton told a friend she was "scared that her ex-boyfriend was getting out of jail soon and that he was going to come after her."  However, the attorney conceded there was "some question" as to whether Thornton was referring to Broutzakis because Thornton did not specifically identify the "ex-boyfriend" and Broutzakis was not "in custody in December."

The State argued there was no "admissible evidence that even remotely links Broutzakis to Thornton's murder."  The State pointed out Broutzakis did not appear on the Vine Court Apartments video surveillance system; no witness could place him near Thornton's apartment around the time of the murder or say he was still in contact with Thornton; and the most recent voicemail messages from Broutzakis in August, October, and November were not threatening.   The prosecutor also told the court that during an interview with the building manager, the building manager said that Broutzakis previously gained access to the apartment building by following other people through the front door and not "through some secret entry."

Unlike in <u>Franklin</u>, the court properly focused solely on the connection of the proffered other suspect evidence to the crime.  For example, the court asked the defense whether there was "any evidence that [Broutzakis] was present in that apartment."

[S]o I just need some facts that's going to help me make the point

---

[6]   [Court of Appeals' footnote]  On appeal, Wade asserts "Broutzakis previously had been convicted of assaulting Ms. Thornton by <u>strangling</u> her."  But in his trial brief, Wade stated that Broutzakis assaulted Thornton by striking her in the head with a leg of a coffee table.  According to Wade's trial brief, after this assault, Thornton told police Broutzakis had "beat her up" before, including strangling her on three occasions.

REPORT AND RECOMMENDATION - 20

of connection that this is not just again a bad actor out there who's part of this person's past. It's just got to be a little bit more. There has to be some nexus or some connection to a nexus or in connection to the event that is at issue in this case.

At the conclusion of the lengthy pretrial hearing, the court ruled the evidence Wade sought to admit was speculative and relied on inadmissible hearsay.

> The evidence proffered . . . is speculative, and it relies upon a great deal of hearsay that would not be admissible.
> Let me just say that I recognize that a defendant has a right to present a Defense, but we know that that right is not absolute. The evidence proffered needs to be relevant and not speculative.
> If there was some evidence that Georgios Broutzakis was at the apartment during the relevant time period, I can assure you that this court would be coming to a different conclusion. Mr. Broutzakis may be a bad actor with a violent history involving Ms. Thornton, and in fact may have a motive to harm her, but the cases that I've read tells us that motive alone is not enough.
> The evidence proffered here is far too tenuous, and there's not a sufficient foundation of facts or circumstances that the other suspect evidence being offered should be allowed.

The court did not abuse its discretion in excluding speculative and inadmissible evidence that Broutzakis murdered Thornton. There was no physical evidence connecting Broutzakis to the murder and no evidence Broutzakis was anywhere near Thornton's apartment when the crime occurred. While, as the trial court described, the evidence indicates Broutzakis was a "bad actor with a violent history involving Ms. Thornton," the facts and circumstances do not show a nonspeculative link between Broutzakis and the crime.

. . . .

We hold that because there is no admissible evidence pointing to a nonspeculative link between Broutzakis and the crime, the court did not abuse its discretion in excluding other suspect evidence.

(Dkt. 10, Ex. 2 at 12-17.)

Because the evidence which petitioner sought to admit was deemed inadmissible based upon legitimate evidentiary concerns, petitioner suffered no violation of his right to present a defense. Accordingly, petitioner's federal habeas petition should be denied with respect to his

REPORT AND RECOMMENDATION - 21

second ground for relief.

Ground Three:  Jury Instructions

Petitioner asserts in his third ground for relief that the trial court erred in failing to instruct the jury on the lesser included offenses of first and second degree manslaughter.  (Dkt. 3 at 8.)  Petitioner maintains that there were sufficient facts in the record to support the giving of the lesser included offense instructions.  (*Id*.)

Petitioner's trial counsel offered instructions on the lesser included offenses of manslaughter in the first degree and manslaughter in the second degree.  Counsel argued that the instructions were appropriate because "this is a circumstantial case" and "the jury hasn't been given any direct evidence as to what exactly occurred in that room with Ms. Thornton."  (Dkt. 10, Ex. 18 at 44-45.)  The State objected to the giving of the proposed lesser included offense instructions on the grounds that there was "no evidence of any reckless or negligent act of [sic] behalf of defendant.  Either he did it or he didn't."  (*Id*., Ex. 18 at 42.)  The trial court agreed with the State, concluding "I don't think that there's anything that would support a lesser included at this point."  (*Id*., Ex. 18 at 45-46.)  The Court of Appeals agreed, concluding that, on the evidence presented, "no jury could rationally find Wade guilty of manslaughter in the first degree or manslaughter in the second degree and not murder in the second degree."  (Dkt. 10, Ex. 2 at 21.)

Claims of error concerning state jury instructions are generally matters of state law that are not cognizable on federal habeas review.  *Estelle v. McGuire*, 502 U.S. 62, 71-72 (1991).  Federal habeas relief is available only when the petitioner demonstrates that the instructional error "so infected the entire trial that the resulting conviction violates due process."  *Estelle*, 502 U.S. at 72 (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)).  Where the challenge is to the

REPORT AND RECOMMENDATION - 22

failure to give an instruction, the petitioner's burden is "especially heavy" because "[a]n omission, or an incomplete instruction is less likely to be prejudicial than a misstatement of the law." *Henderson v. Kibbe*, 431 U.S. 145, 155 (1977).

The United States Supreme Court made clear in *Beck v. Alabama*, 447 U.S. 625 (1980), that the failure to instruct on a lesser included offense can constitute constitutional error in a capital case. *Id.* at 638. However, the Supreme Court expressly reserved judgment as to "whether the Due Process Clause would require the giving of such instructions in a non-capital case." *Id.* at 637-38, n.14. Under the law of the Ninth Circuit, "the failure of a state trial court to instruct on lesser included offenses in a non-capital case does not present a federal constitutional question." *Windham v. Merkle*, 163 F.3d 1092, 1106 (9th Cir. 1998) (citing *Turner*, 63 F.3d at 819). The Court notes as well that the Supreme Court has made clear that even in a capital case, "due process requires that a lesser included offense instruction be given *only* when the evidence warrants such an instruction." *Hopper v. Evans*, 456 U.S. 605, 611 (1982) (emphasis in original).

Because petitioner was charged with the non-capital offense of murder in the second degree, the trial court's failure to instruct on lesser included offenses does not implicate petitioner's federal constitutional rights and, thus, petitioner's claim of instructional error provides no basis for federal habeas relief. Even assuming petitioner's claim can properly be construed as one implicating federal constitutional concerns, the Court of Appeals reasonably concluded that there was no evidence presented which would support the giving of inferior degree instructions. Accordingly, petitioner's federal habeas petition should be denied with respect to his third ground for relief.

/ / /

REPORT AND RECOMMENDATION - 23

Certificate of Appealability

A petitioner seeking post-conviction relief under § 2254 may appeal a district court's dismissal of his federal habeas petition only after obtaining a certificate of appealability (COA) from a district or circuit judge.  A certificate of appealability may issue only where a petitioner has made "a substantial showing of the denial of a constitutional right."  See 28 U.S.C. § 2253(c)(3).  A petitioner satisfies this standard "by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).  Under this standard, this Court concludes that petitioner is not entitled to a certificate of appealability with respect to any of the claims asserted in his petition.

CONCLUSION

Based on the foregoing, this Court recommends that petitioner's petition for writ of habeas corpus be denied and that this action be dismissed with prejudice.  This Court also recommends that a certificate of appealability be denied with respect to all claims asserted in this federal habeas action.  A proposed order accompanies this Report and Recommendation.

OBJECTIONS

Objections to this Report and Recommendation, if any, should be filed with the Clerk and served upon all parties to this suit within **twenty-one (21) days** of the date on which this Report and Recommendation is signed.  Failure to file objections within the specified time may affect your right to appeal.  Objections should be noted for consideration on the District Judge's motions calendar for the third Friday after they are filed.  Responses to objections may be filed within **fourteen (14) days** after service of objections.  If no timely objections are filed, the

REPORT AND RECOMMENDATION - 24

matter will be ready for consideration by the District Judge on **March 10, 2017**.

DATED this 15th day of February, 2017.

Mary Alice Theiler
United States Magistrate Judge

REPORT AND RECOMMENDATION - 25